# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

MIRELDA SANCHEZ TOKARCZYK,

             Plaintiff,

v.

Roosevelt Park Police Chief DAVE BOONE,
in his individual and official capacity,
Roosevelt Park Police Officers, ROB
SYPIEN, RONALD BURNS, and LESLIE
BOND STRYCHAR, in their individual and
official capacities, and Councilperson
MELISSA "Missy" KLOS, and the CITY OF
ROOSEVELT PARK, Defendants.

Case No: 1:18-cv-1015
Honorable:
Magistrate:

_____/

Nicholas H. Klaus (P81076)
Klaus Law PLLC
520 South Union Street
Traverse City, MI  49684
313-757-2052
nicholas@klauslawpllc.com
*Attorney for Plaintiff*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Now comes Plaintiff MIRELDA SANCHEZ-TOKARCZYK, by and

through her attorneys, Klaus Law, P.L.L.C. and, for her Complaint, alleges the

following:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiff MIRELDA SANCHEZ TOKARCZYK (hereafter "MIRELDA") seeks relief for injuries stemming from Defendants' violations of her rights, privileges and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and laws of the State of Michigan, particularly, Michigan Elliot-Larson Civil Rights Act MCL § 37.2201 *et seq.*

2.      Defendants' herein conspired to violate Plaintiff's Constitutional rights and deliberately caused Plaintiff's employment to be terminated and caused her to be unable to find gainful employment as a law enforcement officer in the region in retaliation for Plaintiff MIRELDA SANCHEZ TOKARCZYK's First Amendment protected speech.

3.      Defendants, CITY OF ROOSEVELT PARK, by and through the City of Roosevelt Police Department, a municipal corporation (hereafter "CITY"), City of Roosevelt Park Councilperson MELISSA KLOS acting individually and in her official/supervisory capacity, City of Roosevelt Police Department Chief DAVE BOONE, acting individually and in his official/supervisory capacity, and City of Roosevelt Park Police Department Officers ROB SYPIEN, RONALD BURNS, and LESLIE BOND STRYCHAR acting in their individual and/or offical capacities, jointly and severally, did violate the rights of   MIRELDA SANCHEZ TOKARCZYK to be free from discrimination based on race and gender, and

2

retaliatory action, including termination for complaining about such discrimination, that did cause severe emotional distress and injury, all in violation of rights secured by the First and Fourteenth Amendments to the United States Constitution, and the Michigan Elliott-Larson Civil Rights Act.

4.      Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of attorneys' fees and costs, and any such additional relief as the Court deems proper.

## JURISDICTION

5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiff's federal constitutional and civil rights.

6.      Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

7.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all State law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

8.     Venue is proper in the United States District Court for the Western District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that the events giving rise to the Plaintiff's claim occurred in this judicial district.

## JURY DEMAND

9.     Plaintiff demands a trial by jury in this action on each and every one of her claims.

## PARTIES

10.     Plaintiff MIRELDA SANCHEZ TOCKARZYK is a citizen of the United States and, at all times relevant herein, was a resident of the County of Muskegon, State of Michigan.

11.     Defendant CITY OF ROOSEVELT PARK is a Municipal Corporation authorized by the laws of the State of Michigan to operate the City of Roosevelt Park Police Department law enforcement agency which is an integral part of the CITY, and as such, among other duties and responsibilities, operates, deploys, controls, and supervises the City of Roosevelt Police Department Officers, including Defendant SYPIEN, Defendant BURNS, and Defendant STRYCHAR.

12.     Defendant CITY OF ROOSEVELT PARK Police Department CHIEF DAVE BOONE (hereafter "CHIEF") was at all times relevant to the facts herein, the Chief of Police for the City of Roosevelt Park, and a citizen of the City of Roosevelt Park, Muskegon County, Michigan, and a policymaker with regard to the

customs, policies, and practices of the CITY, in particular he supervises, controls, and determines the hiring, training and discipline of the individual defendant and Plaintiff law enforcement officers herein. As such, at all times relevant hereto, Defendant BOONE was acting in his official capacity as a policymaker for Defendant CITY.

13. Defendant Officer RONALD BURNS (hereafter "BURNS") was at all times relevant to the facts herein, a full-time City of Roosevelt Park Police Officer, an agent and employee of the Defendants, and a citizen of the City of Roosevelt Park, Muskegon County, Michigan. Defendant officer BURNS was also the "senior officer" subordinate of Defendant CHIEF, and, for all intents and purposes, the CHIEF's second in command.

14. Defendant Officer ROB SYPIEN (hereafter "SYPIEN") was at all times relevant to the facts herein, a full-time City of Roosevelt Park Police Officer, an agent and employee of the Defendant CITY, and a citizen of the City of Roosevelt Park, Muskegon County, Michigan.

15. Defendant Officer LESLIE BOND STRYCHAR (hereafter "STRYCHAR") was at all times relevant to the facts herein, a part-time City of Roosevelt Park Police Officer, an agent and employee of the Defendant CITY, and a citizen of Muskegon County, Michigan.

16.     Defendant Councilperson MELISSA "Missy" KLOS (hereafter "KLOS") was at all times relevant to the facts herein, a City of Roosevelt Park Councilperson, and agent and employee of the Defendant CITY, and a citizen of Muskegon County, Michigan.

17.     At all times relevant herein, each of the individual Defendants were employees and agents of Defendant CITY, acting under color of law, within the scope of their employment and authority, and pursuant to the CITY'S customs, policies, and/or practices, which were the moving force behind the constitutional violations asserted herein.

18.     At all times relevant herein, the individual Defendants violated rights clearly established under the Constitution of the United States, in particular under the First and Fourteenth Amendments, and the Michigan Elliott-Larson Civil Rights Act MCL § 37.2201 *et seq* of which reasonable law enforcement officers and/or public official under these respective circumstances would have known.

## **FACTS**

19.     Plaintiff MIRELDA SANCHEZ TOKARCZYK is a married Hispanic woman, with three children, an entrepreneur/owner of Tokarczyk Services of Muskegon, LLC and Olivia Leigh, LLC, and, at all times relevant, a licensed police officer in the employ of the Defendant CITY.

20.     Plaintiff began her employment as a CITY OF ROOSEVELT PARK Police Officer on road patrol duty in June of 2005.

21.     In August 2011, Plaintiff gave birth to her second child and took an approximately 90-day maternity leave to recover from the birth and care for her newborn child.

22.     Plaintiff returned to work at the CITY Police Department in November 2011 and was assigned to a temporary position working the front desk of the CITY Police Department.

23.     Plaintiff was told that if she wished to remain as a front desk police officer, she would be required to formally apply for, and be accepted for the position, and that the position would be open to the public.

24.     Plaintiff did apply and was hired in January 2012, with a six-month probationary period.

25.     Having successfully completed the six-month probationary period, Plaintiff became a permanent CITY employee, versus a temporary employee.

26.     Thereafter, Plaintiff was assigned a regular and unwavering schedule. However, Mrs. TOKARCZYK was informed that, because the position was part-time, she would not be entitled to any holidays, weekends, overtime, or eligible to pick up any open road-patrol shifts.

27.    However, other CITY positions and internal applicants were not subjected to the same hiring process, To wit, Caucasian males were applying for posts and promotions and were not required to complete a six-month probationary period.

28.    In 2015, a newly-hired CITY Defendant police officer STRYCHAR began making racist comments and a pattern of harassment against Plaintiff, including throwing Plaintiff's personal effects and beverages on the floor.

29.    Defendant STRYCHAR would refer to Plaintiff as a "chihuahua," because of her status as a Hispanic person, and would describe her bowel movements and other bathroom activities to Plaintiff, with great detail, in an effort to make her uncomfortable.

30.    Plaintiff made repeated complaints to Defendant CITY police CHIEF BOONE, who took no action to remedy the situation.

31.    Instead, in response to Plaintiff's complaints regarding the racist and inappropriate behavior directed to her, Defendant BOONE's senior officer, Defendant BURNS, told Plaintiff that she should consider taking more time off or find another job in nearby Fruitport.

32.    Interestingly, after Defendant BURNS and CHIEF informed the Plaintiff that Defendant STRYCHAR wanted Plaintiff's position at the department, Defendant BURNS suggested that Plaintiff find employment outside the department.

8

33.     This suggestion by Defendant BURNS came after he had indicated that Plaintiff's front-desk position would go to Defendant STRYCHAR, (who had assumed the position temporarily during Plaintiff's maternity leave in 2016).

34.     Around this same time, Plaintiff was informed by the CITY police department that she would be required to ask permission to use the bathroom, take a break, or eat lunch.   However, this policy was only applied to Plaintiff and was in retaliation for the complaints she made regarding disparate treatment, racist comments, and inappropriate behavior.

35.     Indeed, other white officers at the CITY police department were not required to give notice, or gain permission to use the restroom, or eat lunch.

36.     Plaintiff also complained to Defendant CHIEF regarding her disparate treatment as to the application of the bathroom notice policy, where she was effectively singled out.

37.     Plaintiff also notified the Defendant CHIEF regarding problems with the CITY officers' daily log reports, which were missing, omitted, and/or removed, in violation of the CITY's policies and procedures and the Michigan Freedom of Information Act.

38.     On August 5, 2015, and August 15, 2015, Plaintiff sent emails to Defendant CHIEF BOONE, expressing her fears of retaliation by other officers, including Defendants BURNS, SYPIEN, and STRYCHAR.

39.     In January 2016, Plaintiff gave the human resources department and Defendant CHIEF BOONE notice that she was pregnant with her third child and would be taking time off, at some point thereafter, for the birth of that child sometime in the following summer.

40.     Plaintiff asked the Defendant CHIEF to keep her pregnancy private until such time as she was ready to make a public announcement due to her fear of retaliation by other officers.

41.     The very next day, Defendant SYPIEN told Plaintiff that she was "brave" for having a third child.  The only way SYPIEN could have known that she was pregnant was if Defendant CHIEF shared Plaintiff's private medical information with Defendant SYPIEN.

42.     Thereafter, Defendants SYPIEN and BURNS began to further alienate Plaintiff, precluding her from road-patrol briefings, contrary to departmental policy, in an effort to limit her effectiveness in her duties.

43.     Defendants SYPIEN and BURNS also deliberately slammed doors so hard that they would rattle the women's lockers in effort to further intimidate Plaintiff, and BURNS would often wait in the parking lot of the Police Department to stare-down and leer at Plaintiff as she was coming and/or going, and even went so far as saying that, to those who crossed them he would "make their ass quiver."

44.     Defendant BURNS would also ask Plaintiff when she planned to take her lunch, and then, deliberately go to lunch moments before, so that she would be forced to forego her own break.

45.     Often, Defendant BURNS would fabricate situations in order to call Plaintiff's competency into question.

46.     For example, Defendant BURNS would deliberately make false allegations to Defendant CHIEF BOONE that Plaintiff did not know, after 12 years of working at the Police Department, how to send a fax or look-up reports in the electronic records system.

47.     When Plaintiff would defend herself against such deliberately misleading and untrue allegations, Defendant BURNS would admonish her not to send him "negative emails."

48.     On March 7, 2016, Plaintiff emailed Defendant CHIEF noting that her complaints regarding disparate treatment due to her gender and race she was being subjected to, had not been documented or otherwise addressed in any way.

49.     On April 16, 2016, Plaintiff filed an internal complaint regarding the racial and gender discrimination she'd been experiencing.

50.     On April 18, 2016, as result of, and in response to the complaint, Defendant CHIEF responded with hostility by assaulting Plaintiff, deliberately

11

blocking the exit of the room, and getting within inches of her face, yelling at her to stop making complaints.

51.     Indeed, in response to Plaintiff's internal, external, formal and casual complaints regarding disparate and discriminatory treatment, the Defendant CHIEF informed Plaintiff that he would not take steps to rectify, or even investigate the allegations.

52.     Indeed, in May of 2016, Defendant Councilperson MELISSA KLOS, a close personal friend of Defendant BURNS, told another CITY resident that Plaintiff was "slitting her own throat" by complaining of the disparate treatment.  Defendant KLOS went on to remark that she hoped that her new neighbors were "not Mexicans."

53.     Defendant KLOS sent disparaging emails about Plaintiff to Diane Murphy, a former CITY councilperson and resident and went so far as telling others that she and Defendant BURNS wanted Plaintiff gone from the department.

54.     On June 14, 2016, Plaintiff went into labor with her third child, and took of time for maternity leave until September of 2016.

55.     However, after returning to work in September of 2016, Plaintiff was placed on road patrol, which does not have a set-schedule, as opposed to her former position as front-desk officer.

56.    Plaintiff was told that, per-CITY and Departmental police, they would no longer staff the front desk with police officers.

57.    However, a witness present for the decision-making by Defendants CHIEF, BURNS, and SYPIEN related that the actual reason for taking Plaintiff off the front-desk duty and placing her on road-patrol, was due to the latter not having a set-schedule, and that as such, it would make it difficult for Plaintiff to conform her familial obligations to that of the road-patrol duty, effectively forcing her to leave the department

58.    Indeed, Defendant Senior Officer BURNS told other officers that he had a personal vendetta against Plaintiff.

59.    As such, Defendant BURNS would deliberately nit-pick the work of Plaintiff, even complaining about the way she parked her cruiser in the one stall garage with a cement curb.

60.    Defendant SYPIEN would deliberately craft a schedule that conflicted with the female officers' personal obligations, and in particular, Plaintiff's, while giving preference and accommodations to the white male part-time officers.

61.    Contrary to that policy, Defendant CHIEF hired his Caucasian friend, to fill the front-desk officer position, without subjecting him to the same hiring procedure applied to Plaintiff when she was hired for the permanent position.

13

62.     Indeed, Plaintiff was never given an opportunity to re-apply for her former position at the front desk because the position was never posted, publicly or otherwise.

63.     In September 2016 Plaintiff began her run for a CITY council position.

64.     Contrary to the policies and procedures of the CITY Police Department, and the ordinances of the CITY, Plaintiff was informed that in the event that she was elected, the CITY would require her resignation from the Police Department.

65.     In October of 2016, Plaintiff filed claims of discrimination with the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission.  However, those charges were later withdrawn and then dismissed.

66.     Defendant SYPIEN was in charge of making the schedule for road patrol officers in the CITY.

67.     However, Defendant SYPIEN would give schedule preferences to white male officers and would not do the same for Plaintiff; the sole Hispanic person in the police department.

68.     Such practice and custom was certified by the Defendant CHIEF BOONE where he would cover shifts for white CITY officers' so that they could have recreational outings, but would not do the same for Plaintiff when she had family or personal obligations that conflicted with her schedule.

69.     Because of the disparate treatment, Plaintiff complained to the Defendant CHIEF via email on November 7, 2016.

70.     In response the CHEIF later told her that, per-department policy, schedule accommodations would only be made for people with military obligations.

71.     However, as applied, the policy was not enforced except as to Plaintiff and white male part-time officers were given accommodations to comport with their personal and moonlighting schedules.

72.     Conversely, when open shifts were available for part-time officers, the CITY had a de facto policy of precluding Plaintiff an any opportunity to pick up those shifts.

73.     From approximately November to December of 2016, Defendant SYPIEN would deliberately conceal the open shifts from Plaintiff until after the shifts had already been taken by white male officers.

74.     Again, Plaintiff complained to the Defendant CHIEF about the disparate treatment, again to no avail.

75.     In response to, and in retaliation for her complaints regarding the discriminatory treatment, on January 2017 Defendant CHIEF asked to speak with Plaintiff regarding her event planning business.

76.     Thereafter, Plaintiff explained the event planning business, and the CHIEF did not bring it up again until months later, when, on June 6, 2017, Defendant

explained that, per departmental policy, officers were precluded from secondary employment in non-security-related positions.

77.     However, to the extent that such a policy did exist, it was never enforced or applied to part-time officers that were white males, many of whom also worked as or in:

      a.  Construction helper;

      b.   professional choir;

      c.  skilled trades;

      d.   health care;

      e.  Grand Valley instructors and tutors;

      f.   paper service;

      g.  State Farm Insurance;

      h.  house cleaning; and,

      i.  babysitting, among other positions.

78.     Furthermore, Defendant SYPIEN would give scheduling preferences to accommodate the above side-jobs but would refuse to afford the same to Plaintiff.

79.     Plaintiff had never before received any formal write ups, but was being singled out for violating the moonlighting policy.  Meanwhile, however, Defendant STRYCHAR, as well as other officers, were often found sleeping while on duty, in

cruisers, and even on a couch in the CITY police department, of which the Defendant CHIEF was well-aware.

80.     Defendant CHIEF singled-out Plaintiff for discipline, where he failed to discipline any other officers for violations of departmental policy for incidents he was well aware, including:

a. Defendant STRYCHAR coaching youth soccer in full-uniform, including his firearm, that resulted in a verbal confrontation with a mother of one of the participants. The resident even called the CITY police department, and spoke to the Defendant CHIEF, to make a formal complaint, which was never recorded or otherwise documented;

b. Defendant STRYCHAR and others failing to show up for work without giving notice of absence;

c. Defendant BURNS refusal to wear body armor, in direct contradiction of departmental policy;

d. Officers, including Defendant BURNS, refusing to respond to resident calls to police for help, even after many calls for assistance from the same residents; Indeed, in one incident of Defendant BURNS not responding to multiple calls for assistance on Thanksgiving 2016, the resident appeared at a CITY council meeting to complain, and Defendant Councilperson KLOS deliberately and falsely blamed Plaintiff, who was not on shift at that time;

e. Defendant SYPIEN refusing to appear in court to swear to warrants;

f. Officers refusing to fill-out daily logs, pursuant to departmental policy; and;

g. Defendant STRYCHAR noting on her daily log that she was "hiding from snow, doing donuts" in her police cruiser, as well as referring to an African-American CITY resident as an "asshole."

81.    Indeed, Defendant CHIEF burns received complaints from many residents regarding the behavior and failure to fulfill duties by Defendant BURNS and failed to appropriately discipline him at any time.

82.    Moreover, other women that worked in the CITY police department and the CITY were afraid of Defendant BURNS, and made their fears known to Defendant CHIEF who failed to take any action to remedy or address their concerns. These women have since left the CITY.

83.    On February 24, 2017, contrary to the policy articulated and applied as against Plaintiff after she had returned from maternity leave, Defendant CHIEF circulated an email seeking a certified officer to staff the front-desk position.

84.    The hiring process utilized for that position was again different, and less rigorous than that which was earlier applied to Plaintiff, and again, the position was not publicly or internally posted, and Plaintiff was never given an opportunity to reapply for the position.

85.    Indeed, Defendant CHIEF hired his son's girlfriend, a non-police officer, because "she wanted office experience."

86.    In March of 2017, Plaintiff again filed several charges with the Michigan Civil Rights and Equal Employment Opportunity Commissions, alleging various incidents, patterns, practices, and customs of and relating to racial and gender discrimination as against the plaintiff.

87.     On March 20, 2017, Defendant SYPIEN circulated an email to Defendants CHIEF and BURNS complaining that Plaintiff had been overheard talking about a part-time employee union.

88.     Thereafter, in June of 2017, during one of the Plaintiff's medical check-ups, her doctor expressed concern that she was losing weight.

89.     Plaintiff's doctor diagnosed the weight-loss as the result of the hostile work environment and stress therefrom and ordered her off work for three-months so that she could gain a healthy weight.

90.     On June 8, 2017, Plaintiff conveyed the doctor's order and medical leave request to the Defendant CHIEF and the police department.

91.     On June 14, 2017, Plaintiff was given notice that she was required to attend disciplinary hearing regarding her secondary employment.

92.     The hearing held on June 21, 2017, was illusory, insofar as Plaintiff was not given an opportunity to clear her name or question the merit of the allegations levied against her.

93.     Indeed, Plaintiff was never afforded any of the progressive discipline contemplated in the CITY's policies and procedures.

94.     At the hearing, Plaintiff was informed by the Defendant CITY that she was not entitled to medical leave by virtue of her part-time status.

95.     On June 28, 2017 Plaintiff received notice of her termination, predicated upon her secondary employment.  However, as stated above, other white, male, part-time and full-time officers, similarly situated, were allowed to participate in non-police, non-military secondary employment, without the need to conform to the same policies that were applied to Plaintiff.

96.     Furthermore, other white male part-time officers employed by the CITY were granted medical leave requests, for months at a time, for injuries they sustained, including injuries sustained outside of their employment with the CITY and during the course of their secondary employment, as well as to attend social functions, go hunting, and other activities.  At no time were any of these part-time white male officers disciplined or fired for their medical leave requests or injuries.

97.     Because of the disparaging remarks made by Defendants CHIEF, SYPIEN, BURNS, STRYCHAR, and KLOS, Plaintiff has been unable to find employment as a police officer in any of the surrounding communities or region and has been effectively precluded from working within her field.

98.     As a result of Defendants actions, Plaintiff has lost, or stands to lose, her law enforcement accreditations and license required to find employment in, and work as, her chose field as a police officer.

99.     As a direct and proximate result of the foregoing actions, Plaintiff SANCHEZ has suffered the following injuries, among others:

a.  loss of pay and benefits;

b.  loss of vacation and sick days;

c.  loss of career opportunities;

d.   humiliation and embarrassment, mental anguish and emotional distress;

e.  loss of professional reputation;

f.   loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

g.  Loss of consortium;

h.   and incurred substantial liability for attorney fees and costs of litigation.


## CLAIMS

### COUNT I:
### 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION
### (DEFENDANTS CITY, BOONE, BURNS, SYPIEN, STRYCHAR, and KLOS)

100.   Plaintiff hereby re-alleges and incorporates by reference all of the paragraphs above as if fully set forth herein word for word.

101.   Defendants CITY, BOONE, SYPIEN, have retaliated against Plaintiff for her complaints regarding matters of public concern for racist, discriminatory, and harassing behaviour and policies, by disciplining and terminating, and

otherwise sanctioning plaintiff, thus chilling Plaintiff's speech, in violation of her rights under the First Amendment.

102.    As a direct and proximate result of the foregoing actions, SANCHEZ has suffered the following injuries, among others:

      a.  loss of pay and benefits;

      b.  loss of vacation and sick days;

      c.  loss of career opportunities;

      d.   humiliation and embarrassment, mental anguish and emotional distress;

      e.  loss of professional reputation;

      f.   and loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

      g.  Loss of consortium;

      h.   and incurred substantial liability for attorney fees and costs of litigation.

## COUNT II:
## RETALIATION - ELLIOT-LARSEN CIVIL RIGHTS ACT
### M.C.L. § 37.2101 *et. seq.*
## (DEFENDANTS CITY, BOONE, BURNS, SYPIEN, STRYCHAR, and KLOS)

103.    All preceding paragraphs are incorporated by reference.

104.    Defendant retaliated against and terminated Plaintiff for making complaints protected under the ELCRA.

105.    Defendant's actions were intentional, with reckless indifference and in disregard of Plaintiff's rights.

106.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to:

    a.  loss of pay and benefits;

    b.  loss of vacation and sick days;

    c.  loss of career opportunities;

    d.   humiliation and embarrassment, mental anguish and emotional distress;

    e.  loss of professional reputation;

    f.   and loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

    g.  Loss of consortium;

    h.   and incurred substantial liability for attorney fees and costs of litigation.

## COUNT III:
## RACIAL AND GENDER DISCRIMINATION - ELLIOT-LARSEN CIVIL RIGHTS ACT, M.C.L. § 37.2101 *et. seq.*
## DEFENDANTS CITY, BOONE, BURNS, SYPIEN, STRYCHAR, and KLOS)

107.    All preceding paragraphs are incorporated by reference.

108.    At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

109.    Defendant treated Plaintiff different than similarly situated male, Caucasian, and non-pregnant employees, or those employees that had not recently given birth to a child.

110.    Plaintiff's race and/or gender was a factor that made a difference in Defendant's decision to terminate Plaintiff.

111.    Defendant's actions were intentional, with reckless indifference and in disregard of Plaintiff's rights and sensibilities.

112.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to:

> a.  loss of pay and benefits;
>
> b.  loss of vacation and sick days;
>
> c.  loss of career opportunities;
>
> d.  humiliation and embarrassment, mental anguish and emotional distress;
>
> e.  loss of professional reputation;
>
> f.  and loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;
>
> g.  Loss of consortium;
>
> h.  and incurred substantial liability for attorney fees and costs of litigation.

**COUNT IV:**
**42 U.S.C. § 1983**

24

## <u>FOURTEENTH AMENDMENT EQUAL PROTECTION AS APPLIED ("Protected Class") (DEFENDANTS CITY, BOONE, BURNS, SYPIEN, STRYCHAR, and KLOS)</u>

113.   Plaintiff hereby re-alleges and incorporates by reference all of the paragraphs above as if fully set forth herein word for word.

114.   Defendants have violated Plaintiff's Fourteenth Amendment Right to Equal Protection.

115.   Plaintiff is a member of a protected class by virtue of being a woman, a pregnant person, a person that had recently given birth, and by virtue of being a Hispanic person.

116.   Defendants have continually harassed and disparaged Plaintiff, eventually terminating her employment.

117.   Defendants have held Plaintiff accountable to policies, practices, procedures, and customs that were not applied to similarly situated, non-Hispanic, non-pregnant, or non-female, white employees.

118.   As a direct and proximate result of the foregoing actions, SANCHEZ has suffered the following injuries, among others:

a.  loss of pay and benefits;

b.  loss of vacation and sick days;

c.  loss of career opportunities;

d.   humiliation and embarrassment, mental anguish and emotional distress;

e.  loss of professional reputation;

f.   and loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

g.  Loss of consortium;

h.   and incurred substantial liability for attorney fees and costs of litigation.

**COUNT V:**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT SUBSTANTIVE and/or**
**PROCEDURAL DUE PROCESS -- CONSTITUTIONAL DEFAMATION**
**(DEFENDANTS CITY, BOONE, BURNS, SYPIEN, STRYCHAR, and**
**KLOS)**

119.   Plaintiff hereby re-alleges and incorporates by reference all of the paragraphs above as if fully set forth herein word for word.

120.   As described above, Defendants, acting pursuant to their policies and/or practices and/or customs, have deprived Plaintiff of her liberty interest to find gainful employment in her chose field and maintain her law enforcement license and certifications, said right being secured by the Fourteenth Amendment of the United States Constitution.

121.   Defendants have continually publicly harassed and publicly disparaged Plaintiff, eventually terminating her employment.

122.   As a direct and proximate result of the foregoing actions, SANCHEZ has suffered the following injuries, among others:

a.  loss of pay and benefits;

b.  loss of vacation and sick days;

c.  loss of career opportunities;

d.   humiliation and embarrassment, mental anguish and emotional distress;

e.  loss of professional reputation;

f.   and loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

g.  Loss of consortium;

h.   and incurred substantial liability for attorney fees and costs of litigation.

**COUNT VI:**
**42 U.S.C. § 1983**
**MONELL CLAIM**
**(CITY DEFENDANT)**

123.   Plaintiff hereby re-alleges and incorporates by reference all paragraphs above as if fully set forth herein word for word.

124.   At all times herein, Defendant CITY through its Police Department, supervisors and/or policymakers, including Defendant KLOS and BOONE, established and/or maintained the following customs, usages, policies and/or practices:

a. Failure to train, supervise, and/or discipline law enforcement officers, including but not limited to the individually named Defendant officers and/or deputies herein, with regard to employment and workplace practices, while at all times knowing that this lack of training, supervision and discipline would likely result in hostile working conditions, gender-based discrimination, and racial discrimination;

b. Condoning, approving and acquiescing in known unconstitutional conduct, and known patterns of unconstitutional conduct, undertaking by its officers and supervisors.

125.   Each of the aforementioned policies and/or practices, i.e., the failures to train, supervise, and/or discipline the individually named Defendants, was known to Defendant CITY, as being highly likely and probable to cause violations of the constitutional rights of members of the public, including but not limited to Plaintiff herein.

126.   The conduct of the individually named Defendants herein was committed pursuant to the customs, policies and/or practices of Defendant CITY.

127.   Each such custom, policy and/or practice, referenced above, was a moving force in the violations of Plaintiff's constitutional rights, as set forth herein.

128.   As a direct and proximate result of the foregoing actions, Plaintiff SANCHEZ has suffered the following injuries, among others:

a. loss of pay and benefits;

b. loss of vacation and sick days;

c. loss of career opportunities;

d.  humiliation and embarrassment, mental anguish and emotional distress;

e. loss of professional reputation;

   f.   loss of the ordinary pleasures of everyday life, including the right to pursue his gainful occupation of choice;

   g.   Loss of consortium;

   h.   and incurred substantial liability for attorney fees and costs of litigation.

## **RELIEF**

**WHEREFORE**, Plaintiffs demand the following relief jointly and severally against all Defendants:

   a)  A declaration that Defendants violated the law of the State of Michigan and the federal constitutional rights of Plaintiff;

   b)  Compensatory damages for the aforementioned physical, emotional, and economic injuries suffered by Plaintiff by reason of Defendants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence;

   c)  Punitive and exemplary damages against the individual Defendants to the extent allowable by law;

   d)  Attorneys fees, as allowed, pursuant to 42 U.S.C. §1988;

   e)  The costs and disbursements of this action; and

   f)  Such other and further relief as appears just and proper.

Respectfully submitted,
**KLAUS LAW P.L.L.C.**

By: _/s/_Nicholas Klaus___
Nicholas Klaus (P81076)
520 South Union Street
Traverse City, MI 49685
(313) 757-2052

Dated:  September 7, 2018                    Nicholas@klauslawpllc.com